IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SALADINE JOHNSON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  21-2372 |
| Commissioner of Social Security | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                      June 28, 2022

Saladine Johnson ("Plaintiff") seeks review of the Commissioner's decision

denying his application for supplemental security income ("SSI").  For the reasons that

follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is

supported by substantial evidence.

## I.    PROCEDURAL HISTORY

Plaintiff applied for SSI on November 26, 2013, alleging disability due to leg

problems, hip and right arm problems, and post-traumatic stress disorder ("PTSD").  Tr.

at 180-88, 194, 206.[1]  Plaintiff's application was denied initially, id. at 105-08, and

Plaintiff requested a hearing before an ALJ, id. at 109-11, which took place in two parts

and without counsel, on December 8, 2015, and January 22, 2016.  Id. at 81-94, 30-66.

On May 2, 2016, the ALJ found that Plaintiff was not disabled.  Id. at 15-24.   The

Appeals Council denied Plaintiff's request for review on July 14, 2017.  Id. at 1-6.

---

[1]Plaintiff alleged disability as of November 23, 2006, but, the earliest month for which SSI benefits can be paid "is the month following the month you filed the application."  20 C.F.R. § 416.335.

On September 12, 2017, Plaintiff commenced a civil action with this court, docketed at Civil Action Number 17-4086, and the Honorable Cynthia M. Rufe, to whom the case was assigned, appointed counsel.  Johnson v. Soc. Sec. Admin., Civ. No. 17-4086, Order (E.D. Pa. Oct. 3, 2018).  On referral from Judge Rufe, on December 26, 2019, I issued a Report and Recommendation ("R&R") recommending that the matter be remanded for further proceedings on the grounds that the ALJ failed in his heightened duty to an unrepresented claimant to develop the record.  Johnson v. Soc. Sec. Admin., Civ. No. 17-4086, R&R (E.D. Pa. Dec. 26, 2019) (ECF Doc. 28); tr. at 349-68.  On January 24, 2020, Judge Rufe granted Plaintiff's request for review in light of newly-issued Third Circuit decisions,[2] vacated the R&R, and remanded for a hearing before a constitutionally-appointed ALJ.  Johnson v. Soc. Sec. Admin., Civ. No. 17-4086, Order (E.D. Pa. Jan. 24, 2020) (ECF Doc. 31); tr. at 371.  On June 30, 2020, the Appeals Council remanded to a different ALJ with instructions to consolidate the remanded case with a subsequent application for SSI which Plaintiff had filed on January 8, 2019, offer Plaintiff the opportunity for a hearing, address additional evidence submitted, and issue a new decision on the consolidated claims.  Tr. at 375-78.[3]

---

[2]Specifically, Judge Rufe's January 24, 2020 Order cited Third Circuit decisions issued the day before in Cirko v. Comm'r of Soc. Sec. and Bizarre v. Comm'r of Soc. Sec., 948 F.3d 148 (3d Cir. 2020) (consolidated), which held that Social Security claimants were entitled to new hearings before constitutionally appointed ALJs, despite the failure to raise their Appointments Clause challenge at the administrative level.

[3]Plaintiff's January 8, 2019 application is not contained in the administrative record.  However, the record does include determinations made at the initial and reconsideration levels on that application, see tr. at 380-98 (initial determination), 400-12

A different ALJ conducted a telephonic hearing on January 14, 2021.  Tr. at 299-

325.  On February 9, 2021, the ALJ issued a decision finding that Plaintiff was not

disabled.  Id. at 280-89.  The Appeals Council did not review the ALJ's February 9, 2021

decision, which therefore became the final decision of the Commissioner by operation of

law on April 11, 2021.  Id. at 278; 20 C.F.R. § 416.1484(d).

Plaintiff commenced this action in federal court on May 24, 2021, Doc. 1, and the

matter is now fully briefed and ripe for review.  Docs. 9-11.[4]

## II.  LEGAL STANDARDS

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

> 1.    Whether the claimant is currently engaged in
> substantial gainful activity;
>
> 2.    If not, whether the claimant has a "severe
> impairment" that significantly limits his physical or mental
> ability to perform basic work activities;
>
> 3.    If so, whether based on the medical evidence,
> the impairment meets or equals the criteria of an impairment
> listed in the listing of impairments ("Listings"), 20 C.F.R. pt.

---

(reconsideration determination), as well as notices of unfavorable decisions made at the
initial and reconsideration levels of review.  Id. at 442-46, 448-51.

[4]The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C.
§ 636(c).  See Standing Order, In RE:  Direct Assignment of Social Security Appeal
Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018); Docs. 6, 7.

404, subpt. P, app. 1, which results in a presumption of
disability;

4.      If the impairment does not meet or equal the
criteria for a listed impairment, whether, despite the severe
impairment, the claimant has the RFC to perform his past
work; and

5.      If the claimant cannot perform his past work,
then the final step is to determine whether there is other work
in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R.

§ 416.920(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the

burden shifts to the Commissioner at the fifth step to establish that the claimant is capable

of performing other jobs in the local and national economies, in light of his age,

education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88,

92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether substantial evidence supports the Commissioner's conclusion that Plaintiff is not

disabled.  Substantial evidence is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion," and must be "more than a mere scintilla."

Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir.

2005)); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (substantial evidence

"means only – 'such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229

(1938)).  The court has plenary review of legal issues.  Schaudeck, 181 F.3d at 431.

## III.   DISCUSSION

### A.   ALJ's Findings and Plaintiff's Claims

The ALJ found that Plaintiff suffers from the severe impairments of neuropathy of

the lower extremities, depressive disorder, and PTSD, and medically determinable but

non-severe obesity.  Tr. at 282-83.  The ALJ next found that Plaintiff did not have an

impairment or combination of impairments that met the Listings, id. at 283, and that

Plaintiff retained the RFC to perform sedentary work with the following non-exertional

limitations: simple, routine tasks, with few workplace changes and no interaction with the

general public; and frequent grasping, fingering, or feeling with the dominant right upper

extremity.  Id. at 284.  Plaintiff had no past relevant work but, based on the testimony of

the vocational expert ("VE"), the ALJ found that Plaintiff could perform jobs in the

national economy including dowel inspector, assembler, and nut sorter.  Id. at 288-89.

Thus, the ALJ found that Plaintiff was not disabled.  Id. at 289.

Plaintiff claims that (1) the ALJ improperly failed to find Plaintiff's residuals from

gunshot wounds to be medically determinable or severe, resulting in a flawed RFC

assessment, (2) the ALJ rejected the opinion of examining physician Mark Christopher,

M.D., for erroneous reasons, (3) the ALJ failed to include all of Plaintiff's limitations in

the hypothetical posed to the VE, and (4) the ALJ's decision is constitutionally defective

because the ALJ exercised power he did not lawfully possess due to a constitutionally

defective delegation of power.  Doc. 9 at 5-20; Doc. 11 at 1-15.[5]  Defendant responds that

the ALJ's decision under review is supported by substantial evidence.  Doc. 10 at 18-29.

Although Defendant agrees that the statutory provision governing the appointment of the

Commissioner violates the separation of powers to the extent it limits the President's

authority to remove the Commissioner without cause, she argues that the constitutional

defect does not provide a basis for remand.  Id. at 6-17.

      **B.**    **<u>Summary of the Record</u>[6]**

      Plaintiff was born on July 29, 1977, and thus was 36 years old at the time of his

application and 43 years old at the time of the February 9, 2021 ALJ decision under

review.  Tr. at 42, 180.  Plaintiff is five feet eight inches tall and weighs between

approximately 164 and 208 pounds.  Id. at 206, 320, 701, 829.  Plaintiff completed the

eleventh grade and has no specialized job training, id. at 207, 307, and no past relevant

work.  Id. at 288.  He lives with his mother in a first-floor apartment.  Id. at 313.

      In November 2006, Plaintiff suffered nine gunshot wounds to all four extremities.

Tr. at 250.  He suffered a fracture of the left femoral shaft, a right subtrochanteric femur

fracture, right ulnar shaft fracture with nerve deficits, and a left proximal radius fracture.

---

[5]Plaintiff's arguments have been renumbered for purposes of discussion, and the first two claims will be discussed together.

[6]As Plaintiff's claims are concerned with the ALJ's consideration of his physical impairments, the summary will focus primarily on Plaintiff's physical treatment record, including records summarized in my prior R&R, where appropriate.

Id. at 249.  Plaintiff underwent open reduction and internal fixation ("ORIF")[7] of his right

and left femurs, plating of the right ulna, and splinting of the left radius.  Id. at 250.[8]

On January 27, 2014, Dr. Christopher performed an internal medicine consultative

examination of Plaintiff.  Tr. at 259-62.  The doctor found that Plaintiff

> was in moderate distress, exhibiting pain predominantly in his
> hips and leg.  His gait was unsteady favoring the left.  He
> could not walk on his heels and toes.  Squat was 10%.  Stance
> was leaning to the right.  Used no assistive devices.  Needed
> no help changing for exam.  He was able to get off from the
> table, but with extreme difficulty.  Able to rise from chair
> without difficulty.

Id. at 260.  The doctor noted "significant pain on raising his left knee with weakness of

4/5 in the left lower extremities" and an absence of deep tendon reflexes ("DTRs") in

Plaintiff's upper and lower extremities with swelling of the left knee and right wrist.  Id.

at 259.  The doctor also found a positive straight leg raise at 30 degrees bilaterally[9] and

_____

[7]ORIF "refers to a surgical procedure to fix severely broken bones.  Open
reduction means surgery is necessary to reorient the bone fracture into the normal
position.  Internal fixation refers to the hardware such as metal pins, steel rods, screws, or
plates used to keep the bone fracture stable in order to heal the right way and to help
prevent infection."  See https://www.orthopaedics.com.sg/treatments/orthopaedic-
surgeries/screw-fixation/ (last visited June 8, 2022).

[8]Although there are no physical therapy notes in the record, the surgical notes
indicate that Plaintiff was released from the hospital non-weight-bearing in all
extremities, that further surgery was possible, and that the nerve deficits in the upper
extremities would be followed and appropriate occupational therapy prescribed.  Tr. at
256.

[9]The straight leg-raising test checks for impingement of the nerves in the lower
back by determining whether there is pain when "the symptomatic leg is lifted with the
knee fully extended; pain in the lower extremity between 30 and 90 degrees of elevation
indicates lumbar radiculopathy, with the distribution of the pain indicating the nerve root

tenderness in the left knee and right wrist.  Id. at 261.  Dr. Christopher found limitations in range of motion of Plaintiff's knees, hips, and cervical and lumbar spine.  Id. at 263-64.  Plaintiff reported that his medications included gabapentin, ibuprofen, famotidine, triamcinolone ointment, and oxycodone.  Id. at 259.[10]  Dr. Christopher found that Plaintiff could occasionally lift and carry up to ten pounds occasionally, and could sit for two hours and stand and walk for one hour each in an eight-hour day.  Id. at 265-66.  The doctor further opined that Plaintiff could never use his right (dominant) hand for reaching, handling, fingering, feeling, or pushing/pulling, could frequently use his left hand for these activities, and could never operate foot controls with his left foot because of knee pain and weakness.  Id. at 267.  The doctor also indicated that Plaintiff could not ambulate without a wheelchair, two canes or two crutches, and could not walk a block on uneven/rough surfaces or climb steps with the use of a single handrail.  Id. at 270.

On February 7, 2014, after reviewing the records at the initial determination stage, Kurt Maas, M.D., concluded that Plaintiff could lift and carry ten pounds frequently, and stand or walk for two hours and sit for about six hours in an eight-hour workday.  Tr. at

involved."  Dorland's Illustrated Medical Dictionary, 32nd ed. (2012) ("DIMD"), at 1900, 1006.

[10]Gabapentin is an anticonvulsant used to treat neuropathic pain.  See https://www.drugs.com/gabapentin.html (last visited June 8, 2022).  Famotidine (marketed as Pepcid or Zantac) is a histamine-2 blocker used to reduce the amount of acid the stomach produces and to prevent ulcers in the stomach and intestines.  See https://www.drugs.com/famotidine.html (last visited June 8, 2022).  Triamcinolone is a corticosteroid which reduces inflammation.  See https://www.drugs.com/triamcinolone.html (last visited June 8, 2022).  Oxycodone is an opioid pain medication used to treat moderate to severe pain.  See https://www.drugs.com/oxycodone.html (last visited June 8, 2022).

100.  Dr. Maas opined that Plaintiff was limited in both lower extremities, had exertional

limitations due to his fractures and ORIF, could never crawl or climb ladders, ropes, and

scaffolds, could occasionally climb ropes and stairs, balance, stoop, kneel, and crouch,

and should avoid concentrated exposure to vibration and even moderate exposure to

hazards such as machinery and heights.  Id. at 101-02.

In a Department of Public Welfare ("DPW") form completed by Nand Ram,

M.D.,[11] the doctor indicated diagnoses of multiple gunshot wounds, multiple fractures

and plating, and PTSD.  Tr. at 274.  Plaintiff testified at his first administrative hearing

that he had been treating with Dr. Ram for almost two years, and that Dr. Ram indicated

that he was permanently disabled.  Id. at 37, 39.  The copy of the DPW form contained in

the record is nearly illegible and it is unclear if Dr. Ram checked the box for permanent

disability.  Id. at 273.

On January 10, 2016, Plaintiff was admitted to Temple University Hospital for

additional gunshot wounds.  Tr. at 766-823.  A bullet went through Plaintiff's right lower

extremity, through his scrotum causing a left testicular rupture, and embedded in his left

lower extremity.  Id. at 774, 781, 795.  Examinations revealed 5/5 strength in all

extremities and equal grips bilaterally.  Id. at 770-71.  Plaintiff underwent surgery for the

---

[11]The date on the form is not legible, although the index provides a date of April 14, 2014.  Court Transcript Index, Exh. 3F.  Additionally, although it appears that the doctor's name is Nand Ram, M.D., see, e.g., tr. at 728, 744, 746, the index states that the form was completed by Nand Rum, M.D., and the printed name which appears on the DPW form could be "Rum" or "Ram" (id. at 274).  Moreover, a summary of the medical evidence included in the 2019 Disability Determination Explanation gives the doctor's name as both "Nand Ram, M.D." and "Nand Rum, M.D."  Id. at 383.

testicular rupture and associated hematoma.  Id. at 766-68, 799-801.  Plaintiff was

discharged on January 13, 2016, with directions to resume usual activities as tolerated

and return to work, and do no heavy lifting or strenuous activity.  Id. at 792.

On December 21, 2016, x-rays of Plaintiff's left knee and both femurs revealed

bullet fragments along both femurs and post-ORIF intramedullary rods and screws

bilaterally, with anatomic alignment, bone mineralization within normal limits, and no

evidence of acute fracture or hardware failure.  Tr. at 676, 679.  X-rays were also taken of

Plaintiff's right elbow and wrist, revealing "[p]ost ORIF: healed distal ulnar fracture in

anatomic alignment.  No other findings."  Id. at 675, 678.

On February 27, 2018, Plaintiff presented to Temple University Hospital with

complaints of left intermittent hearing loss.  Tr. at 829.  Plaintiff reported that he could

walk up two flights of stairs without stopping.  Id. at 830.  Upon examination, Plaintiff

exhibited a steady gait with no clubbing or edema of the extremities.  Id. at 831.  He

underwent a myringotomy and had a ventilating tube inserted into his left ear.  Id. at 841-

42.[12]

On November 15, 2018, Jeffrey Henstenburg, M.D., of Drexel Medicine

performed an orthopedic evaluation of Plaintiff for complaints of left femur and left

lateral knee pain.  Tr. at 689-92.  Dr. Henstenburg noted that Plaintiff had tried various

medications with narcotics prescribed intermittently by his primary care physician, and

---

[12]Myringotomy is defined as the creation of a hole in the tympanic membrane of
the ear.  DIMD at 1226.

that he currently took Percocet.  Id. at 689.[13]  The doctor assessed Plaintiff with continuing pain in the femur and neuropathy of the left lower extremity, and noted that x-rays of Plaintiff's left femur and left knee taken that day demonstrated the presence of bullet fragments.  Id. at 691, 694-95.  Plaintiff's treatment plan included a nerve conduction study for evaluation of neuropathy, referral for pain management evaluation and treatment of chronic neuropathic pain from the gunshot wound to the left leg, and physical therapy.  Id. at 692.  Plaintiff indicated that he wished to have the bullet fragment removed, but he was advised that the location of the bullet prohibited its removal without unnecessary risk.  Id.

On May 24, 2019, Michael Rosenberg, M.D., performed a consultative internal medicine examination of Plaintiff, whom the doctor described as "a poor historian."  Tr. at 700-03.  Plaintiff stated that he suffered multiple gunshot wounds in 2006 with resulting left wrist and femur surgery, a gunshot wound to his testicle in 2016, and hernia surgery at Hahnemann in 2018.  Id. at 700.[14]  Plaintiff reported having "constant" pain in both thighs and his left knee, rated 9/10 and described as "sharp, dull, and achy," and which worsens with walking, standing, sitting and bending.  Id.  His current medications

---

[13]Percocet contains a combination of the pain reliever acetaminophen and oxycodone, and is used to relieve moderate to severe pain.  See https://www.drugs.com/percocet.html (last visited June 8, 2022).

[14]The administrative record does not contain records from Hahnemann Hospital. At the January 14, 2021 hearing, Plaintiff's counsel indicated that the hospital had closed and that he did not know how to obtain the records.  Tr. at 304.

included ibuprofen, loratadine, gabapentin, Valium, and Endocet.  Id.[15]  Dr. Rosenberg

noted that Plaintiff lives with his mother, can make sandwiches and use a microwave, do

basic cleaning, likes to read, can shower and dress himself with assistance, and cannot

shop or do laundry.  Id. at 701.  Plaintiff appeared to be in no acute distress, exhibited a

slow and deliberate gait with a noticeable limp, could not walk on heels and toes, and

declined to squat.  Id.  He apparently needed help changing for the exam, required no

help getting on and off the exam table, and rose from a chair without difficulty.  Id.

Upon examination, Plaintiff exhibited no abnormality of the thoracic spine, negative

straight-leg raising bilaterally both seated and supine, no evident joint deformity or joint

instability, and pain with range of motion of the left knee, left ankle, right wrist, and

lumbosacral spine.  Id. at 702.  DTRs were exhibited in Plaintiff's right upper extremity

only, with slight decreased sensation in his right hand, right lower leg, and right foot, and

pain involving the left leg and left foot.  Id.  Plaintiff exhibited 2/5 strength in the left

lower extremity and 5/5 in the remaining extremities, pain upon palpation of both thighs

and with range of motion of hips and knees, with no cyanosis, clubbing, edema, or

muscle atrophy.  Id.  Plaintiff's hand and finger dexterity were intact, he could pick up

small and large objects bilaterally, could zip, button, and tie, and exhibited 5/5 grip

strength bilaterally.  Id. at 703.  Dr. Rosenberg diagnosed Plaintiff with mild bilateral

---

[15]Loratadine is an antihistamine used to treat allergies.  See
https://www.drugs.com/loratadine.html (last visited June 8, 2022).  Valium is a
benzodiazepine used to treat anxiety disorders, alcohol withdrawal symptoms, or muscle
spasms.  See https://www.drugs.com/valium.html (last visited June 8, 2022).  Endocet,
like Percocet, contains a combination of the pain reliever acetaminophen and oxycodone.
See https://www.drugs.com/endocet.html (last visited June 8, 2022).

thigh pain, mild to moderate left knee pain, sensory neuropathy involving both lower extremities with pain involving the left leg and left foot, motor neuropathy involving the left lower extremity, minimal to mild right wrist pain, and mild left ankle and back pain. Id.

Dr. Rosenberg also completed a medical source statement of Plaintiff's ability to do work-related activities. Tr. at 704-09. The doctor opined that Plaintiff could continuously lift and carry up to twenty pounds and never lift more than that; could sit for three hours continuously and for six hours total in an eight-hour workday; could stand and walk at one time continuously for four and one-half hours each; and could stand or walk for four hours each in total in an eight-hour workday. Id. at 704-05. Dr. Rosenberg indicated that Plaintiff was unlimited in the use of his left hand and, and that with his dominant right hand he could continuously reach and push/pull, and frequently handle, finger, and feel. Id. at 706. The doctor further indicated that Plaintiff could continuously operate foot controls with his right foot, but only occasionally do so with his left foot. Id. Regarding postural activities, Dr. Rosenberg opined that Plaintiff could never crawl or climb stairs and ramps, occasionally kneel and crouch, and frequently balance and stoop. Id. at 707. Regarding environmental limitations, the doctor opined that Plaintiff could occasionally operate a motor vehicle, frequently tolerate unprotected heights and moving mechanical parts, and was not otherwise limited. Id. at 708.

On June 25, 2019, David P. Clark, M.D., reviewed Plaintiff's records and completed an RFC assessment as part of the disability determination explanation related to Plaintiff's January 2019 application. Tr. at 389-93. Dr. Clark opined that Plaintiff

could frequently lift and/or carry ten pounds, sit and/or walk for a total of two hours, and

sit for a total of six hours in an eight-hour workday, and that his ability to push and/or

pull was unlimited other than what was indicated for lift and/or carry. Id. at 389-90. Dr.

Clark further opined that Plaintiff could never crawl or climb ladders, ropes, and

scaffolds, and could occasionally climb ramps/stairs, balance, stoop, kneel, and crouch.

Id. at 390. The doctor found that Plaintiff had no manipulative, visual, or communicative

limitations, and that he should avoid concentrated exposure to vibration and hazards such

as machinery and heights. Id. at 391.

During follow-up visits with Dr. Ram in October and November 2019, Plaintiff

exhibited normal gait and station, intact muscle strength and tone, normal range of

motion, and normal sensation. Tr. at 744 (10/11/19), 746 (11/25/19).

On December 4, 2019, Sanjay Gandhi, M.D., reviewed Plaintiff's records and

completed an RFC assessment as part of his disability determination at the

reconsideration level. Tr. at 406-10. Dr. Gandhi's RFC assessment is identical to that of

Dr. Clark, except that Dr. Gandhi found Plaintiff to be limited in his ability to push

and/or pull with his left lower extremity and should avoid concentrated exposure to

extreme cold, extreme heat and wetness in addition to vibration and hazards. Id. at 407-

08.

On January 23, 2020, Plaintiff underwent the surgical removal of two distal

interlocking screws in his left knee to relieve pain associated with the implanted

hardware. Tr. at 860-64. Post-operative impressions included no acute fracture or

dislocation, and no retained hardware. Id. at 863-64.

14

On November 17, 2020, upon the retirement of Dr. Ram, Plaintiff presented to Anish Sethi, D.O., for treatment of bilateral knee, hip, and right arm pain. Tr. at 951-56. Plaintiff reported some relief of symptoms of his left distal femur after the removal of the hardware, with pain ranging from 5 -to- 9/10 and described as "achey, throbbing, burning, and tingling" (id. at 951) for which he took ibuprofen, gabapentin, and oxycodone-acetaminophen. Id. at 953. Plaintiff also reported that he previously participated in physical therapy and was performing home exercises. Id. at 907. Upon examination, Plaintiff exhibited an antalgic gait, tenderness to palpation in the lumbar spine, decreased flexion, extension, and rotation in the lumbar spine, and positive straight-leg testing at thirty degrees with pain in the bilateral thighs, 5/5 muscle strength in his bilateral hip flexors, and 5/5 muscle strength in his bilateral knee extensors. Id. at 954. No examination findings were noted regarding Plaintiff's right arm. Id.

On December 11, 2020, Plaintiff followed up with Dr. Sethi regarding his extremity pain. Tr. at 946-50. The doctor noted that given Plaintiff's chronic pain and co-morbid conditions, he was continued on gabapentin, ibuprofen and opioid medications, with his dose "weaned down" and "only to be taken during periods of acute pain flareups." Id. at 946. Plaintiff noted pain flare-ups in the colder months and reported that his pain remained managed with medications. Id.

At the January 14, 2021 administrative hearing, Plaintiff testified that he has had chronic pain since his gunshot wounds in 2006. Tr. at 313. He testified that he still has hardware in his left femur and continues to experience a lot of pain around that area. Id.

15

at 313-14.[16]  He also testified that the 2016 gunshot "jammed" into his left femur close to the sciatic nerve and next to the main artery, making it risky to remove and resulting in permanent nerve damage.  Id. at 314.  Plaintiff explained that he has a plate in his right arm and a screw in his right wrist since the 2006 gunshot wounds, and that he had to learn to write again, and that his hand still cramps and stiffens up.  Id. at 314-15.  He estimated that over the past seven years he averaged four days per week of bad pain and three days that are a little better, and that the pain is 9/10 on the bad days.  Id. at 315.  He spends bad days in bed with his legs elevated, relies on his mother for household chores and cooking, and uses a cane at times when he leaves his apartment and also inside if the pain is bad.  Id. at 316-17.  Plaintiff estimated that he can walk one -to- one and a half blocks before stopping, depending on the level of pain, that he can stand about eight to ten minutes before having to sit down, and that he can sit about the same amount of time before needing to stand.  Id. at 317-18.[17]

A VE also testified at the January 14, 2021 hearing.  Tr. at 320-25.  The ALJ asked the VE to assume an individual of Plaintiff's age and education with no past relevant work, who was limited to sedentary work and restricted to simple routine tasks with few workplace changes, no interaction with the general public, and who could

---

[16]Plaintiff clarified that although he had some hardware removed from his left knee in January 2020, he still had some hardware remaining in his left leg.  Tr. at 319.

[17]Plaintiff's girlfriend Ikea Mobley testified at his first administrative hearing, stating that she helped Plaintiff with most of his daily activities, and that he was not able to sit, stand, or walk without taking breaks.  Tr. at 52-53.  Ms. Mobley also completed a written report in 2013 in which she indicated that Plaintiff could not walk, stand, or sit for long periods of time, and that he had difficulty using his hands.  Id. at 197-204.

perform frequent grasping, fingering, or feeling with the right dominant upper extremity.
Id. at 321.  The VE testified that there were jobs such a person could perform, including
dowel inspector, assembler, and nut sorter.  Id.  When asked if the same individual were
restricted to only occasional grasping, fingering, or feeling with the dominant right upper
extremity, the VE testified that the person would not be able to work at the sedentary
level.  Id. at 322.  In response to questioning by counsel, the VE testified that if the
hypothetical individual were limited to lifting and carrying up to ten pounds occasionally,
and in an eight-hour workday were limited to sitting for two hours, standing for one hour,
and walking for one hour total, such a person would not be able to perform any work on a
full-time basis.  Id. at 322-23.

### C.   Plaintiff's Claims

#### 1.   Opinion Evidence and RFC Assessment

Plaintiff's first two claims are related and will be considered together.  He asserts
that the ALJ improperly failed to find Plaintiff's residuals from gunshot wounds to be
medically determinable or severe, resulting in a flawed RFC assessment, and that the ALJ
rejected the opinion of consultative examiner Dr. Christopher for erroneous reasons.
Doc. 9 at 12-20; Doc. 11 at 1-6.  Defendant responds that the ALJ properly evaluated the
opinion evidence and that the RFC is supported by substantial evidence.  Doc. 10 at 18-
29.

a.      Consideration of Medical Opinion Evidence

According to the opinion-weighing paradigm applicable to Plaintiff's case,[18] a

treating physician's opinion is entitled to be given greater weight than that of a physician

who conducted a one-time examination of the claimant as a consultant.  See, e.g., Adorno

v. Shalala, 40 F.3d 43, 47-48 (3d. Cir. 1994) (citing Mason v. Shalala, 994 F.2d 1058,

1067 (3d. Cir. 1993)).  When there is a conflict in the evidence, the ALJ may choose

which evidence to credit and which evidence not to credit, so long as he does not "reject

evidence for no reason or for the wrong reason."  Rutherford v. Barnhart, 399 F.3d 546,

554 (3d Cir. 2005); Plummer v. Apfel, 196 F.3d 422, 429 (3d Cir. 1991); see also 20

C.F.R. § 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a

whole, the more weight we will give to that opinion.").  Also, a physician's statement that

a Plaintiff is "disabled" or "unable to work" is not dispositive.  Adorno, 40 F.3d at 47-48;

see also 20 C.F.R. § 416.927(d)(1) ("A statement by a medical source that you are

'disabled' or 'unable to work' does not mean that we will determine that you are

disabled.").  Rather than blindly accept a medical opinion, the ALJ is required to review

all the medical findings and other evidence and "weigh the relative worth of [the] treating

physician's report."  Adorno, 40 F.3d at 48.

---

[18]Effective March 27, 2017, the Social Security Administration amended the rules regarding the evaluation of medical evidence, eliminating the assignment of weight to any medical opinion.  See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).  Because Plaintiff's application was filed prior to the effective date of the new regulations, the opinion-weighing paradigm is applicable.  Compare 20 C.F.R. § 416.927 with 20 C.F.R. § 416.920c.

Here, the ALJ reviewed the medical opinion evidence regarding Plaintiff's physical impairments as follows:

> The opinions of medical consultants Dr. Maas, Dr. Clark, and Dr. Gandhi that [Plaintiff] is capable of a range of sedentary work are persuasive. These residual functional capacities are consistent with exam findings of a slow and deliberate gait with a noticeable limp, pain with range of motion in the left knee, right wrist, left ankle, and lumbosacral spine, 5/5 strength in all extremities except for the left lower extremity which was 4/5 and intact hand and finger dexterity with 5/5 grip strength bilaterally.

> The opinion of consultative examiner Dr. Christopher is not persuasive or consistent with the objective medical evidence. There is no support for finding that [Plaintiff] can only sit for two hours in an eight-hour workday or that he can never reach, handle, finger or feel with his right hand. This goes beyond even what [Plaintiff] has alleged. Dr. Christopher's own exam findings of [Plaintiff] having 5/5 strength in all extremities except for the left lower extremity which was 4/5 and intact hand and finger dexterity with 5/5 grip strength bilaterally, do not support such a restrictive [RFC].

> Consultative examiner Dr. Rosenberg opined that [Plaintiff] had the capacity to perform sedentary work with only frequent handling, fingering, and feeling with the right upper extremity. These restrictions are consistent with Dr. Rosenberg's exam findings of pain with range of motion of the left knee, right wrist, left ankle, and lumbosacral spine. As well as [Plaintiff's] own allegations of pain in his right upper extremity as a result of a gunshot wound.

Tr. at 287 (record citations omitted). Plaintiff complains that the ALJ's consideration of these assessments was flawed for several reasons. Doc. 9 at 14-18; Doc. 11 at 1-6.

First, Plaintiff argues that the ALJ failed to find Plaintiff's residuals from gunshot wounds to be medically determinable and severe, which in turn caused the ALJ to overstate Plaintiff's RFC. Doc. 9 at 9-11; Doc. 11 at 1-6. This argument is not accurate

insofar as the ALJ found a severe impairment of lower extremity neuropathy, which was attributable to his gunshot wounds including the ongoing presence of bullet fragments in his legs.  Nevertheless, Plaintiff argues that this finding does not incorporate all of the residual effects of Plaintiff's wounds.  Doc. 11 at 2 n.1.  While it is true that the ALJ did not find gunshot residuals to Plaintiff's upper extremities to be severe, the ALJ explicitly discussed all of Plaintiff's gunshot wounds and subsequent treatment at multiple points in his analysis, and took them into account in his RFC assessment.  For example, the ALJ noted that Plaintiff experienced multiple gunshot wounds to the upper and lower extremities in November 2006, described the location of resultant fractures, and that he underwent surgical repair of all fractures (tr. at 285); that Plaintiff had x-rays of his right wrist and elbow in December 2016 that showed a healed ulnar fracture in anatomic alignment (id.); that an internal medicine appointment in October 2019 revealed a normal gait and station, intact muscle strength and tone, normal range of motion, and normal sensation (id. at 286); and that in November 2020, a pain management specialist indicated that Plaintiff's pain was medically managed and made no musculoskeletal examination findings related to Plaintiff's upper extremities (id.).  The ALJ also noted repeated findings of 5/5 grip strength bilaterally, including by Dr. Christopher who found 5/5 strength in all extremities except for the lower left extremity which was 4/5, and intact hand and finger dexterity.  Id. at 286, 287.  Finally, as noted, the ALJ incorporated limitations caused by gunshot wounds to Plaintiff's upper extremities by limiting him to frequent rather than constant grasping, fingering, or feeling with the dominant right extremity.  Id. at 284.

Case 2:21-cv-02372-ETH   Document 13   Filed 06/28/22   Page 21 of 32

Second, Plaintiff argues that the ALJ failed to give proper weight to the opinion of Dr. Christopher. Doc. 9 at 9-10; Doc. 11 at 1-6. I disagree. The ALJ discussed the physical consultative examinations, medical opinions, and prior administrative medical findings in his decision and explained why the opinions of state agency physicians Dr. Maas, Dr. Clark, and Dr. Gandhi, as well as consultative examiner Dr. Rosenberg, that Plaintiff remained capable of sedentary work, were more consistent with the record than the assessment made by consultative examiner Dr. Christopher. For example, the ALJ explained that the record does not support Dr. Christopher's finding that Plaintiff can only sit for only two hours in an eight-hour workday or that he is entirely precluded from using his right hand, noting the doctor's own examination findings that Plaintiff exhibited 5/5 strength in all extremities except his left lower extremity, had intact hand and finger dexterity, and 5/5 grip strength bilaterally. Id. at 287. Notably, Dr. Christopher's own report states that Plaintiff exhibited pain predominantly in his hips and leg, and that he had limitations in range of motion of his knees, hips, and cervical and lumbar spine, but not his upper extremities. Id. at 260, 263-64.

In a related argument, Plaintiff contends that remand is warranted because the ALJ never stated what degree of weight he assigned to the opinions of Drs. Christopher and Rosenberg, instead finding the opinions of the former to be "not persuasive" (tr. at 287) and those of the latter to be "consistent" with his examination findings (id.), and that the ALJ therefore used the terminology from the regulations applicable to cases filed after March 27, 2017. Doc. 11 at 4 n.3 & 6 n.4. Because the ALJ clearly gave more weight to the opinions of the four doctors who found Plaintiff capable of performing sedentary

21

work rather than the opinion of Dr. Christopher, and more importantly because the ALJ explained why he did so, I conclude that on this record the ALJ's usage of "not persuasive" and "consistent" rather than "weight" is semantic rather than substantive.[19]

Third, Plaintiff argues that the ALJ's finding that there was "no support" for Dr. Christopher's opinion is contrary to the record, and cites to examples of record support including Plaintiff's 2006 and 2016 gunshot wounds and subsequent surgeries, and examination findings of unsteady gait, weakness in his left lower extremity, and restricted range of motion. Doc. 9 at 14-16. This argument in essence asks the court to re-weigh evidence the ALJ discussed in his opinion and is therefore rejected. Moreover, even if the ALJ's statement of "no support" constitutes an overstatement, such error is harmless for the reasons previously discussed.

Fourth, Plaintiff argues that the ALJ's statement that Dr. Christopher's opinion "goes beyond what even [Plaintiff] has alleged" is false. Doc. 9 at 16-17. I disagree. For example, whereas Dr. Christopher opined that Plaintiff could perform no manipulation whatsoever, Plaintiff testified to performing activities that require manipulative functioning such as writing and using a cane (tr. at 314-17), and he told Dr. Rosenberg that he could make sandwiches, use a microwave, clean counters and tables, and dress, bathe, and groom himself. Id. at 701, 720. Moreover, for the reasons discussed, substantial evidence supports the ALJ's weighing of the opinion evidence.

---

[19]Furthermore, I note that the regulations applicable to cases filed before March 27, 2017, also utilize terms such as "supportable" and "consistent." See, e.g., 20 C.F.R. §§ 416.927(c)(3) ("Supportability"), (c)(4) ("Consistency").

Finally, Plaintiff argues that the ALJ failed to mention the previous ALJ's assessment that Plaintiff was limited to only occasional use of hand controls with his right upper extremity, and failed to explain the apparent disagreement.  Doc. 9 at 16 n.5.  Although the ALJ did not mention the limitations found by the prior ALJ, the ALJ's summary of the medical opinion evidence noted repeated findings of 5/5 strength in Plaintiff's upper extremities, intact hand and finger dexterity and 5/5 grip strength bilaterally, and explained that those findings were inconsistent with a limitation to frequent use of his right hand.  Tr. at 287-88.[20]  Additionally, courts in the Third Circuit have noted that while prior RFC determinations constitute relevant evidence, ALJs are not bound by prior RFC determinations.  See Dias v. Saul, Civ. No. 17-1812, 2019 WL 4750268, at *6 (M.D. Pa. Sep. 30, 2019) ("Although the ALJ was not bound by the prior RFC determination, the earlier findings are relevant.") (quoting Babyak v. Berryhill, 385 F. Supp.3d 426, 430 (W.D. Pa. 2019); Soli v. Astrue, Civ. No. 08-3483, 2010 WL 2898798, at *6 (E.D. Pa. July 22, 2010) (citing Carter v. Barnhart, 133 F. App'x 33, 35 (3d Cir. 2005) (ALJ not bound by prior findings under doctrine of res judicata because record contained new evidence and involved later time period).  Here, the ALJ explained the basis for his RFC assessment that Plaintiff was limited to "frequent grasping, fingering, or feeling with the dominant right upper extremity."  Tr. at 284.  Thus, the ALJ adequately explained why greater restrictions to use of Plaintiff's right upper extremity

---

[20]Plaintiff also argues that the ALJ failed to note in reviewing Dr. Christopher's examination that Plaintiff had pain and swelling of his right wrist.  Doc. 9 at 16 n.5.  Any error in this regard is harmless in light of the fact that the ALJ credited Dr. Rosenberg's finding that Plaintiff had pain on range of motion in the right hand.  Tr. at 287.

(as found by the prior ALJ) were inconsistent with the record.  Cf. Butler v. Colvin, Civ.

No. 15-1923, 2017 WL 2756268, at *16-17 (M.D. Pa. May 12, 2016) ("Particularly in the

absence of a finding that Plaintiff's condition had improved, some explanation is

warranted as to why a different RFC [than found by the first ALJ] is supported by

substantial evidence.").  In light of the ALJ's explanation, particularly his reliance on

findings of 5/5 strength in Plaintiff's upper extremities, intact hand and finger dexterity

and 5/5 grip strength bilaterally, remand on this basis is not warranted.

Thus, I find no error in the ALJ's characterization of the evidence and conclude

that the ALJ's decision not to credit the limitations found by Dr. Christopher is supported

by substantial evidence.

b.      VE Hypothetical

Plaintiff next complains that the ALJ erred in failing to include limitations found

by Dr. Christopher in the hypothetical posed to the VE.  Doc. 9 at 18-20; Doc. 11 at 6.

Defendant responds that the ALJ was not required to include limitations that he found

were not supported by the record.  Doc. 10 at 28-29.

In order for the VE's testimony to constitute substantial evidence, the hypothetical

question posed must consider all of the claimant's impairments which are supported by

the record.  Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).  "Hypotheticals

are considered deficient when important factors are omitted or the claimant's limitations

are not adequately portrayed."  Emery v. Astrue, Civ. No. 07-2482, 2008 WL 5272454, at

*3 (E.D. Pa. Dec. 18, 2008) (citing Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir.

1984)).

24

Here, as previously explained, the ALJ properly rejected the opinions of Dr.
Christopher, finding them inconsistent with the objective medical evidence, including the
opinions of four physicians who opined that Plaintiff retained the ability to perform a
limited range of sedentary work.  As such the ALJ was not required to include the
limitations contained in Dr. Christopher's assessments in the hypothetical presented to
the VE.

      2.     <u>Constitutionally Defective Delegation of Power</u>

Finally, Plaintiff argues that the ALJ lacked authority to decide this matter because
he acted pursuant to a constitutionally defective delegation of power.  Doc. 9 at 5-20;
Doc. 11 at 1-15.  Although Plaintiff does not strictly argue that the ALJ's decision is
constitutionally defective because the appointment of the Commissioner of Social
Security violates the separation of powers, Plaintiff's argument nevertheless flows from
the Supreme Court's consideration of that constitutional defect in <u>Seila Law LLC v.
Consumer Financial Protection Bureau</u>, 140 S. Ct. 2183 (2020).  Doc. 9 at 5-6; Doc. 11 at
6.  Defendant agrees that the statute governing the appointment of the Commissioner of
Social Security violates the separation of powers, <u>see</u> Doc. 10 at 6-7, but maintains that
this does not support setting aside the decision of the ALJ in this case.  <u>Id.</u> at 6-17.

In <u>Seila Law</u>, the Supreme Court examined the authority of the Director of the
Consumer Financial Protection Bureau ("CFPB") in the context of Article II of the
Constitution vesting executive power in the President.  140 S. Ct. at 2197.  The Court
held that "the CFPB's leadership by a single individual removable only for inefficiency,
neglect, or malfeasance violates the separation of powers."  <u>Id.</u>  The Court described the

structure of the CFPB as "an independent agency led by a single Director and vested with significant executive power," and concluded that the lack of presidential authority to remove such an officer at will had "no basis in history and no place in our constitutional structure."  Id. at 2201.

The Court compared the CFPB to other agencies, including the Social Security Administration, and found important differences.

> After years of litigating the [CFPB]'s constitutionality, the Courts of Appeals, parties, and *amici* have identified "only a handful of isolated" incidents in which Congress has provided good-cause tenure to principal officers who wield power alone rather than as members of a board or commission.  "[T]hese few scattered examples" – four to be exact – shed little light . . . .
> . . . .
> Third, the CFBP's defenders note that the Social Security Administration (SSA) has been run by a single Administrator since 1994.  That example, too, is comparatively recent and controversial.  President Clinton questioned the constitutionality of the SSA's new single-Director structure upon signing it into law.  In addition, unlike the CFPB, the SSA lacks the authority to bring enforcement actions against private parties.  Its role is largely limited to adjudicating claims for Social Security benefits.
> . . . .
> . . . [T]hese isolated examples are modern and contested.  And they do not involve regulatory or enforcement authority remotely comparable to that exercised by the CFPB.  The CFPB's single-Director structure is an innovation with no foothold in history or tradition.

Seila Law, 140 S. Ct. at 2201-02 (internal citations omitted).  Thus, in finding a separation of powers violation in the for-cause restriction on removal of the Director of the CFPB, the Court distinguished the SSA from the CFPB.

Moreover, after determining that "the CFPB's leadership by a single independent Director violates the separation of powers," the Court in Seila Law addressed the remedy for the constitutional violation. 140 S. Ct. at 2207-08. At issue was the enforceability of the CFPB's civil investigative demand issued to a law firm. Rather than simply dismiss the agency's enforcement action, the Court determined that "the removal provision can be severed from the other statutory provisions relating to the CFPB's powers and responsibilities," id. at 2209, noting that "[w]e think it clear that Congress would prefer that we use a scalpel rather than a bulldozer in curing the constitutional defect we identify today." Id. at 2210-11. The Court remanded the matter for a determination whether the civil investigative demand was validly ratified. Id. at 2211.

Here, as noted, Defendant agrees that the provision limiting the President's authority to remove the Commissioner of Social Security without good cause violates the separation of powers. See Doc. 10 at 6-7.[21] However, the parties disagree as to the practical effect of that violation. Plaintiff contends that because the Commissioner delegates authority to ALJs to hear and decide cases pursuant to regulations promulgated

---

[21]Former President Trump nominated Andrew Saul to be Commissioner on April 12, 2018, at which time Nancy Berryhill regained her prior title of Acting Commissioner -- a title she held until the Senate confirmed Mr. Saul as Commissioner on June 4, 2019. Mr. Saul remained Commissioner until President Biden removed him on July 9, 2021, at which time Ms. Kijakazi, as Deputy Commissioner, became Acting Commissioner. See 42 U.S.C. § 902(b)(4) ("The Deputy Commissioner shall be Acting Commissioner . . . during the absence . . . of the Commissioner. . . ."); https://www.ssa.gov/agency/commissioner/ (last visited June 27, 2022). Consistent with this chronology, Acting Commissioner Berryhill ratified the ALJ's appointment on July 16, 2018, as her own, see Social Security Ruling 19-1p, "Effect of the Decision in Lucia . . .," 2019 WL 1324866, at *2 (Mar. 15, 2019), and the ALJ's February 9, 2021 decision was issued under the authority of Commissioner Saul.

by an unconstitutionally appointed Commissioner, such that neither the ALJ nor the Appeals Council had a lawful delegation of authority under which to adjudicate Plaintiff's claim, the administrative decision is constitutionally defective. Doc. 11 at 7-9. Defendant argues that the appointment of the ALJ who decided this case was ratified by an Acting Commissioner, removeable at will, and that Plaintiff has not and cannot show that the removal restriction / unlawful delegation caused the denial of his claim. Doc. 10 at 6-20.[22]

One of my colleagues recently addressed <u>Seila Law</u>'s applicability in the Social Security context. <u>See Wicker v. Kijakazi</u>, Civ. No. 20-4771, 2022 WL 267896 at *8-10 (E.D. Pa. Jan. 28, 2022) (Heffley, M.J.). After reviewing several such cases from across the country, Judge Heffley observed that the district courts have relied on another recent Supreme Court case in rejecting the separation of powers argument in Social Security appeals. <u>Id.</u> at *9 (citing <u>Collins v. Yellen</u>, 141 S. Ct. 1761 (2021)). <u>Collins</u> involved the for-cause removal restriction for the single director of the Federal Housing Finance Agency ("FHFA"), which the Supreme Court found violated the separation of powers. The Court instructed that "whenever a separation-of-powers violation occurs, any aggrieved party *with standing* may file a constitutional challenge." 141 S. Ct. at 1780 (emphasis added). To establish standing, "a plaintiff must show that it has suffered 'an

---

[22]Plaintiff does not dispute that the Acting Commissioner of Social Security ratified the ALJ's appointment, or that an Acting Commissioner, unlike a duly appointed Commissioner, is removeable at will. Rather, Plaintiff argues that because the ALJ issued his decision under the authority of Commissioner Saul, who was subject to unconstitutional removal protection, neither the ALJ nor the Appeals Council had the power to decide Plaintiff's case. Doc. 11 at 8-9.

injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'" Id. at 1779 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). "[F]or purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful conduct' of the defendant, not to the provision of law that is challenged." Id. (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)).[23]

Judge Heffley next quoted a Western District of Washington case to explain the application of Collins to a Social Security benefits review case:

> In Collins, the Directors of the FHFA adopted an amendment . . . to certain financial agreements that "materially changed the nature of the agreements" and resulted in the companies in which plaintiffs were shareholders transferring to the U.S. Treasury "at least $124 billion dollars more than the companies would have had to pay" under the prior form of the agreements. The plaintiffs in Collins thus had an identifiable basis to contend that but for the unconstitutional removal provision, the President may have removed and appointed a different Director who would have disapproved of the adoption (or implementation) of the . . . [a]mendment.
> In contrast, there is nothing showing the Commissioner or the SSA implemented new and relevant agency action that may have turned upon the President's inability to remove the Commissioner. Plaintiff has not identified any new regulations, agency policies or directives Commissioner Saul installed that may have affected her

---

[23]In Seila Law, the Supreme Court "found it sufficient that the challenger 'sustain[ed] injury' from an executive act that allegedly exceeds the official's authority." 140 S. Ct. at 2196 (quoting Bowsher v. Synar, 478 U.S. 714, 721 (1986)). In Collins, the Supreme Court held that the traceability requirement was satisfied because the shareholders suffered a "pocketbook injury" directly traceable to an amendment adopted by the directors of the FHFA that "materially changed the nature of their agreements." 141 S. Ct. at 1779.

> claims.  Plaintiff thus fails to show how or why [the unlawful]
> removal clause possibly harmed her.

Wicker, 2022 WL 267896, at *10 (quoting Lisa Y. v. Comm'r of Soc. Sec., No. C21-

5207, 2021 WL 5177363, at *7 (W.D. Wash. Nov. 8, 2021) (internal citations omitted));

see also Kowalski v. Kijakazi, Civ. No. 20-1783, 2022 WL 526094, at *10-11 (M.D. Pa.

Feb. 22, 2022) (requiring nexus between invalid removal restriction and denial of

application for disability benefits); Mor v. Kijakazi, Civ. No. 21-1730, 2022 WL 73510,

at *5 (D.N.J. Jan. 7, 2022) (same).

    Here, Plaintiff does not identify any traceable injury linked to the allegedly

unconstitutional removal clause, arguing instead that "[s]uch strict causation is not

required in a case like this one which involves government actors exercising power which

they did not lawfully possess."  Doc. 11 at 9 (citing Collins, 141 S. Ct. at 1788).  Like

Judge Heffley, I do not find this sufficient to establish Plaintiff's standing.  "Instead of

merely tracing [his] injury – the denial of disability benefits – to Commissioner Saul's

ability to delegate power to ALJs and the Appeals Council in general, . . .  [Plaintiff's]

burden is higher:  [he] must be able to trace that injury to the actual unconstitutional

removal clause, which is the unlawful conduct in this matter."  Wicker, 2022 WL

267896, at *10; compare Collins, 141 S. Ct. at 1779 ("Because the relevant action in this

case is the . . . amendment, and because the shareholders' concrete injury flows directly

from that amendment, the traceability requirement is satisfied."), with Wicker, 2022 WL

267896, at *10 ("Commissioner Saul did not promulgate a new action affecting or

injuring Wicker . . . .  Commissioner Saul merely occupied the Commissioner role . . . .

[T]he agency continued to function as it had [before <u>Seila Law</u>], given that the removal clause was the only constitutional defect.").

Plaintiff has failed to establish any nexus between the removal restriction / improper delegation and the denial of his application for benefits.  Therefore, I reject Plaintiff's challenge to the ALJ's decision based on the improper delegation of authority to decide this case.

**IV.**   <u>**CONCLUSION**</u>

The decision of the ALJ is supported by substantial evidence.  The ALJ properly considered the opinion evidence and included all limitations supported by the record in his hypothetical to the VE.  In addition, Plaintiff is not entitled to remand based on the alleged improper delegation of authority under which the ALJ adjudicated his case.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SALADINE JOHNSON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  21-2372 |
| Commissioner of Social Security | : | |

## <u>O R D E R</u>

AND NOW, this 28ᵗʰ day of June, 2022, upon consideration of Plaintiff's brief and

statement of issues (Doc. 9), Defendant's response (Doc. 10), and Plaintiff's reply (Doc.

11), and after careful consideration of the administrative record (Doc. 8), IT IS HEREBY

ORDERED that:

1. Judgment is entered affirming the decision of the Commissioner of Social Security and the relief sought by Plaintiff is DENIED, and

2. The Clerk of Court is hereby directed to mark this case closed.

BY THE COURT:

/s/ ELIZABETH T. HEY

_____

ELIZABETH T. HEY, U.S.M.J.